**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TOMMY FULLER,** | ) | **Case No.  1:06 CV 2093** |
| | ) | |
| **Plaintiff,** | ) | **Judge Dan Aaron Polster** |
| | ) | |
| **vs.** | ) | <u>**MEMORANDUM OF OPINION**</u> |
| | ) | <u>**AND ORDER RE: MOTIONS FOR**</u> |
| **CUYAHOGA METROPOLITAN** | ) | <u>**SUMMARY JUDGMENT OF**</u> |
| **HOUSING AUTH., et al.,** | ) | <u>**DEFENDANTS CMHA, BURDYSHAW,**</u> |
| | ) | <u>**HARRIS, JACKSON, AND JAKUB**</u> |
| **Defendants.** | ) | |

Before the Court are the Motions for Summary Judgment of Defendants

Cuyahoga Metropolitan Housing Authority ("CMHA") **(ECF No. 59)**, James Harris and Thomas

Burdyshaw **(ECF No. 60)**, and Christopher Jakub and Anthony Jackson **(ECF No. 58)**

(collectively the "Defendants' Motions" or "Motions").[1]  For the following reasons, Defendants'

Motions are **GRANTED IN PART** and **DENIED IN PART**.

## I.  FACTUAL BACKGROUND

The instant Motions are but the latest pleadings in this most unfortunate case.

The factual background is familiar, having been recited to various degrees at least four times by

---

[1]The Court will identify the specific Motion for Summary Judgment or specific Defendant when necessary.

the Court alone.[2]  In brief, Plaintiff Tommy Fuller was involved in an incident with Defendants Harris and Burdyshaw, both CMHA police officers,[3] which ended with Fuller under arrest and eventually prosecuted for assault on a police officer.  Though Fuller was acquitted, CMHA fired Fuller from his job maintaining the boiler heating systems in some CMHA housing units, a position that Fuller had fulfilled faithfully for approximately nineteen years.  Fuller subsequently filed suit against numerous Defendants, alleging federal and state claims.

Fuller and Defendants disagree on almost all additional facts in the case, especially the facts of what, exactly, happened immediately before and during the incident.  For purposes of Defendants' Summary Judgment Motions, the Court "must lend credence" to Fuller's interpretation of the remaining facts.  *Marvin v. City of Taylor*, 509 F.3d 234, 238 (6th Cir. 2007) (citing *Scott v. Harris*, 127 S. Ct. 1769, 1775 (2007)).  The Court finds the following necessary facts, applicable to the Court's analysis in Section IV below, are as follows.

On Friday, January 3, 2003, Tommy Fuller drove his own personal vehicle toward Woodhill Estates, a CMHA estate to which he was assigned as a fireman,[4] after clocking out at 4:30 p.m., which was the end of his shift.  The central stock room from which the firemen procured necessary repair materials and parts was closed on the weekends except for major emergencies.  Thus, on Friday afternoons during the winter heating season, the heating

---

[2]See ECF No. 28, Mem. of Op. and Order Granting Mot. to Dismiss Def. George Phillips; ECF No. 29, Mem. of Op. and Order Granting Mot. to Dismiss Def. CMHA Board of Commissioners; ECF No. 31, Mem. of Op. and Order Granting in Part and Denying in Part Defs' Mots. to Dismiss; ECF No. 44, Mem. of Op. and Order Granting in Part Defs' Mots. to Dismiss.

[3]Harris and Burdyshaw were both patrol officers on January 3, 2003, though their respective employment status and titles has changed since.

[4]A CMHA fireman is one who operates, maintains, and repairs boilers and heating systems. (See ECF No. 57-2, Pl. Dep., 8:15-9:5, April 24, 2007.)

-2-

department servicemen customarily stocked certain "service rooms" at each CMHA estate with spare parts that might be needed in case a minor problem arose over the weekend.  Using overtime to stock these rooms was prohibited, and Fuller had received a service call close to the end of his shift that day which had prevented him from completing his preventative stocking while still on the clock.  Nonetheless, Fuller wanted to drop off the supplies he had picked up earlier in the day, so he parked his truck in the parking lot at Woodhill Estates after grabbing some fast food on the way there.  Fuller was dressed in his CMHA-issued uniform, as he was just finished with his regular work shift.  The uniform consisted of dark blue trousers, a light blue shirt, a blue winter coat with a patch reading "Fuller" on the side chest area, and a blue knit skullcap with a patch reading "CMHA Heating Department" sewn on the front.[5]

Morris Black Place is one of a handful of housing units that comprise Woodhill Estates.  Morris Black Place Unit G had been vacant since approximately 1995, though a sign still remained identifying the unit as a "CMHA Police Woodhill Homes Crime Prevention Office."  (See ECF No. 61-12, Pl. Opp. Br., Ex. C-1.)  At some point in time, CMHA firemen had informally taken over Unit G as a break room or an ancillary office of sorts.  The door locks were opened by the master keys that these servicemen carried, and the unit had a telephone with an outside line and a working restroom.  Various firemen had contributed random furniture, such that the room now contained a desk and chairs, a couch, and a weight bench.  Fuller and the others took responsibility for keeping Unit G clean.

---

[5]It is unclear in which direction the patch on Fuller's skullcap was facing when he was approached by CMHA police officers.

Fuller parked his truck in front of Morris Black Place Unit G and exited his vehicle.  He needed to use the restroom before stocking the nearby boiler room, so he decided to make a quick stop at Unit G to use the facilities there and then return to his truck for the extra supplies.  Before he reached the building, however, Fuller stopped to exchange pleasantries with a man named Edward Kent, a local resident.  In the meantime, Officers Harris and Burdyshaw were seated in a police cruiser that was parked in the parking lot, observing the scene.  After a few minutes of conversation, Fuller and Kent parted ways, and the officers saw Fuller let himself into Unit G to use the restroom.[6]

While Fuller was in the restroom, Harris and Burdyshaw approached the front of Unit G and "bammed" on the door and/or window.  Fuller paid the sound no attention, as residents knew that they were to call the CMHA heating department number for help rather than to contact individual firemen directly.  The two officers tried to open the door with their police-issued keys, but were unsuccessful as they did not have the proper (master) key.  Receiving no answer from the unknown occupant of Unit G, Harris and Burdyshaw retreated to their car and waited for the individual to exit the building.

As Fuller emerged from Unit G, Harris and Burdyshaw ran toward him with guns drawn, asking whether Fuller lived there (presumably meaning whether Fuller lived in Unit G).

---

[6]Harris and Burdyshaw both aver that they witnessed the two men (Fuller and Kent) talking, and then saw Fuller enter Unit G.  (See ECF No. 60-3, Burdyshaw's Aff., ¶ 2; ECF No. 60-4, Harris's Aff., ¶ 2.)

Fuller indicated that the officers were able to see him when he entered Unit G.  (See Pl. Dep., 34:17-18 ("I told him that you all was there when I went up, so when did this activity start?").)  On the other hand, Fuller also testified that the police cruiser left the lot and drove past Fuller and Kent while the two men were still outside and that Fuller did not see the car again before he entered Unit G. (Pl. Dep., 55:3-9.)

Faced with Fuller's internally inconsistent testimony, the Court will choose the version of the facts that best reconciles Fuller's testimony with that of the officers.

-4-

Fuller replied "no, I don't live here," and then asked "[w]hat is going on?  You all know me.

What you mean [sic] do I live here?  I was in here using the John [sic]."  (ECF No. 57-2, Pl.

Dep., 32:20-24, April 24, 2007.)  On further questioning from the officers, Fuller, who was not

wearing his CMHA-issued work identification card externally, told them that he worked there,

and that his name was Tommy Fuller.  According to the officers' version of the story, which

Fuller does not rebut, Fuller "mutter[ed] that he was Tommie [sic] Fuller and did not have to tell

us anything since he worked there."  (ECF No. 60-3, Def. Burdyshaw's Aff. ¶ 2; ECF No. 60-4,

Def. Harris's Aff. ¶ 2.)  His responses to the officers' further questions were similarly

unresponsive and argumentative.  (See generally, Pl. Dep., 32-36.)

   Harris and Burdyshaw radioed to police dispatch to confirm that Fuller was,

indeed, a CMHA employee.  While they waited for confirmation, still on the stoop of Unit G,

Fuller "was fidgeting with his clothing and pockets."[7]  (Burdyshaw's Aff., ¶ 3; Harris's Aff. ¶ 3.)

Concerned for their safety and worried that Fuller might have a weapon of some sort on his

person, Harris decided to pat Fuller down for weapons.  According to Fuller, Harris "asked me

did I have anything on me he should know about.  I replied to him, well, what are you talking

about; what do you mean?"  (Pl. Dep. 36:7-10.)  Harris told Fuller that "he was going to pat

[Fuller] down," to which Fuller responded "[p]at me down for what?"  (*Id.* 36:11-12.)  Again

Harris asked Fuller whether Fuller "ha[d] anything on me he should know about before he pat

[sic] me down."  (*Id.* 36:12-14.)  Fuller, rather than disclosing that he was carrying a tool belt or

_____

  [7]This subjective observation is not disputed by Fuller's (later) assertion that he "did not
attempt to reach under my jacket to pull any sort of weapon out."  (ECF No. 61-12, Ex. C to Pl.'s
Combined Opp. Br., Pl.'s Aff. ¶ 9.)  Just because Fuller did not attempt to reach under his jacket to
pull out a weapon does not contradict the officers' observations that he was fidgeting with his
clothing and pockets in a way that made the officers concerned for their safety.

vest for work that contained his pliers, work knife, volt meter, wrench, and file, instead again

insisted "pat me down for what?"  (*Id.* 36:14-15.)  The officers also allege, and Fuller does not

deny, that "Fuller stated something to the effect that if anyone touched him, "[i]t was on!"

(Burdyshaw Aff. ¶ 3; Harris Aff. ¶ 3.)

Burdyshaw then made a statement of some sort, to which Fuller responded by

turning his head away from Harris and toward Burdyshaw.  At that point Harris "grabbed

[Fuller] on [his] right arm."  (Pl. Dep. 36:16-21.)  On direct questioning during his deposition,

Fuller then described what happened next as follows: "Naturally, I resist.  I pulled them back

when he pulled.  And when he pulled (indicating), Burdyshaw stepped in to me and started

punching me."  (*Id.* 38:15-17.)  Fuller further explained that when Harris pulled his arm, "I'm

just pulling back because, natural reflex, you're going to resist.  And Burdyshaw stepped in to

me and started punching me . . . in the jaw [and] in the head on the left side."  (*Id.* 38:21-39:2.)

Burdyshaw and Harris "attempted to restrain him since he continued to flail around."

(Burdyshaw's Aff. ¶ 3; Harris's Aff. ¶ 3.)  Fuller does not remember if the officers said anything

to him at this point, though he did testify that he did not strike either officer.[8]  (Pl. Dep. 39:3-6,

23-24.)

In the melee that ensued, the three men tumbled off the short landing and onto the

snow-covered ground.  Fuller continued struggling even after hitting the ground, and the officers

warned Fuller repeatedly to stop struggling or they would be forced to pepper spray him.[9]

_____

[8]Burdyshaw and Harris dispute this version of the facts by asserting that Fuller struck
Burdyshaw.  (Burdyshaw's Aff. ¶ 3; Harris's Aff. ¶ 3.)

[9]Fuller's testimony is internally conflicting and inconsistent on this particular sequence of
events, and thus he is unable to accurately confirm or dispute the officers' version of what
happened.  For instance, Fuller testified that after the men fell off the stoop into the snow "I just

-6-

Apparently Fuller did not stop struggling, and thus Burdyshaw pepper-sprayed him.  Either

Burdyshaw or Harris handcuffed Fuller once he stopped struggling following the pepper

spray application.[10]

   Other officers – both CMHA and Cleveland police – arrived on the scene shortly

thereafter, and Fuller was placed in a police vehicle under the care of other officers.  Defendant

Jakub, a Sergeant with the CMHA police department and the supervisor on duty on January 3,

2003 arrived and took statements from each of Harris, Burdyshaw, and Fuller as part of his

investigation of the incident.  It is unclear whether Fuller was placed in a CMHA or Cleveland

police car, but either way he was eventually transported to St. Vincent Hospital.  At the hospital,

Fuller was treated for contusions and abrasions to his face, and chemical conjunctivitis.  The

medical care providers at the hospital found no evidence of drug or alcohol use.  Fuller was

transported directly to jail upon his release from the hospital, where he remained for four days

without being charged.  Not until January 7, 2003 was Fuller charged with two counts of

felonious assault on a peace officer, after which he was released on bond.

   Fuller proceeded the next morning, January 8, 2003, to the CMHA Police Station

to retrieve his personal possessions and work keys, which had been confiscated when he was

detained.  Fuller inquired about the items, and was informed that he needed to go to the

---

faded in and out." (Pl. Dep. 40:6.)  Also, when asked whether either officer told him to stop
struggling, Fuller testified that "I can't recall, because when I was down, I faded in and out." (*Id.*
40:22-24.)  On the other hand, when Fuller was asked whether he heard either officer tell him that
they were going to pepper-spray him, or whether he said anything during this period of time, Fuller
answered "No" to both inquiries.  (*Id.* 40:25-41:5.)

  [10]Fuller's testimony reconfirms the officers' position that the pepper-spray preceded the
handcuffs; he testified that "I can remember at one point this burning sensation in my face.  And
<u>after that</u> at another point I seen [sic] I was up on my knees with my face down, you know, with the
handcuff [sic] on me." (Pl. Dep. 40:6-10 (emphasis added).)

personnel department the next morning to reclaim them.  Fuller journeyed to the CMHA

personnel department on the morning of January 9, 2003, but rather than return his work keys

and personal possessions, CMHA employment personnel conducted a "hearing" of sorts.

CMHA fired Fuller the next day.

CMHA and the Cuyahoga County Prosecutor also moved forward with Fuller's

prosecution, and on February 3, 2003, Fuller was indicted on two counts of Assault on a Peace

Officer in violation of O.R.C. § 2903.13, based on the incident with Burdyshaw and Harris that

occurred one month earlier.  Fuller asserted his innocence, and on June 3, 2004, after a seven-

day trial, Fuller was acquitted on both counts.

## II.  PROCEDURAL BACKGROUND

The Court's previous Opinion and Order dated January 25, 2007 (ECF No. 31, 4-

6) contains a detailed account of the extensive procedural background of the case to that point,

which the Court need not recite again here.

In the January 25, 2007 Order, the Court dismissed with prejudice some of

Fuller's claims pursuant to Defendants' appropriate motions.  (See ECF No. 31 (dismissing state

law malicious prosecution claims against Defendants CMHA, Burdyshaw, Harris, Jackson, and

Jakub, and dismissing the state law Intentional Infliction of Emotional Distress claim against

Defendant CMHA).)

The Court further dismissed two more claims with prejudice in a Memorandum of

Opinion and Order dated April 2, 2007.  (See ECF No. 44 (dismissing as time-barred federal 42

U.S.C. § 1983 claims for unconstitutional deprivation of right to due process, and deprivation of

right to liberty, health, safety, privacy and welfare).)

Fuller then filed an Amended Complaint (ECF No. 45), which the Court modified on May 8, 2007 by striking all substantive claims and Defendants previously dismissed.  (See ECF No. 48, 4 (listing all dismissed claims and Defendants[11]).)

On October 12, 2007, Defendants Harris, Burdyshaw, Jakub, Jackson, and CMHA (the "Remaining Defendants") filed the instant Motions.  Fuller then filed his combined brief in opposition to the Motions.  (ECF No. 63.)  Three days after Fuller filed his opposition brief, the Court ordered the parties to brief the issue of collateral estoppel as it related to Fuller's state court proceedings.  (ECF No. 62.)  Defendants filed their reply brief on December 7, 2007 (ECF No. 64), and Fuller filed his sur-reply brief on December 21, 2007 (ECF No. 67).

After the various motions and orders, Fuller's remaining claims (as numbered in the Amended Complaint) are as follows: Amended Count I (§ 1983 Use of Excessive Force) as against all Remaining Defendants; Amended Count II (§ 1983 Unreasonable Search or Seizure) as against all Remaining Defendants; Amended Count IV (§ 1985 Conspiracy) as against all Remaining Defendants; Amended Count V (Intentional Infliction of Emotional Distress) as against the Remaining Defendants except Defendant CMHA; Amended Count VI (Negligent Hiring and Retention) as against Defendant CMHA; and Amended Count VII (Negligent Training and Supervision) as against Defendant CMHA.

### III.  JURISDICTION

This Court has jurisdiction over Fuller's federal claims (Amended Counts I, II, and IV) under 28 U.S.C. § 1331.

---

[11]The Court's May 8, 2007 Order erroneously recounted that the state negligence claims were against "all Remaining Defendants" rather than just Defendant CMHA.

# IV.  LAW AND ANALYSIS

## A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).  Once the movant has satisfied its burden, the nonmoving party must produce evidence showing that a genuine issue of material fact remains.  *Plant v. Morton Intl'l Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  The courts' function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'"  *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Summary judgment is proper when the nonmoving party has had adequate time for discovery and yet "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"

*Harris v. Bornhorst*, No. 06-3729, --- F.3d ---, 2008 U.S. App. LEXIS 724, *9-10, slip op. at 4 (6th Cir. Jan. 14, 2008) (quoting *Celotex*, 477 U.S. at 322).  If the nonmoving party fails to make a sufficient showing on an essential element of the case for which it bears the burden of proof, the moving party is entitled to summary judgment as a matter of law.  *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999).  To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial."  *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). It is well-settled that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

        Specifically in the § 1983 context, the Supreme Court recently clarified that "[i]f there is no constitutional violation, then the plaintiff's § 1983 claim fails as a matter of law and the defendant is therefore entitled to summary judgment."  *Marvin*, 509 F.3d at 244 (quoting *Scott v. Harris*, 127 S. Ct. 1769, 1779 (2007)[12]).  Post-*Scott*, therefore, the question of whether a § 1983 plaintiff's Fourth Amendment constitutional rights were violated is generally not a question of fact best reserved for a jury, as Fuller repeatedly argues.  Instead, "[t]he Court explained that '[a]t the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the*

---

[12]In *Scott*, the Supreme Court determined that a police officer did not violate the Fourth Amendment when he rammed a fleeing suspect's car to end a high-speed chase, finding that the officer's actions were objectively reasonable.  *Scott*, 127 S. Ct. at 1776.

-11-

*record* . . . the reasonableness of [the officer's] actions . . . *is a pure question of law*.'" *Id.*

(quoting *Scott*, 127 S. Ct. at 1776 n.8) (first emphasis in original, second emphasis added).

Therefore, the Sixth Circuit has concluded, "the standard articulated by the

Supreme Court in *Scott* clearly dictates that it is a pure question of law for the court to determine

whether, viewing the facts in the light most favorable to the plaintiff, the officers' actions were

objectively reasonable under the circumstances." *Id.* at 246 n.6 (citing *Scott*, 127 S. Ct. at 1776

n.8).  Previous Sixth Circuit authority instructing "that such a determination is for a jury in the

first instance is directly contrary to subsequent Supreme Court authority." *Id.* (citing *St. John v.

Hickey*, 411 F.3d 762, 772 (6th Cir. 2005)).

Accordingly, the threshold determination on Fuller's § 1983 claims – whether a

constitutional violation occurred – is one the Court must determine as a matter of law.  With this

standard in mind, the Court turns to an analysis of Fuller's claims.

**B. § 1983 Excessive Force (Amended Count I)**

**1.  Individual Defendants Harris and Burdyshaw**

Fuller's Amended Count I alleges that the Remaining Defendants violated his

constitutional rights to be free from excessive force during the incident outside Morris Black

Place Unit G.  Defendants Harris and Burdyshaw argue that they are entitled to qualified

immunity, and, consequently, summary judgment as a matter of law.

The Sixth Circuit recently clarified an internal split within the Circuit about the

requirements to successfully bring a § 1983 claim.  To prevail on such a claim, "a plaintiff need

only show that he or she was deprived of a constitutional right by a state actor." *Ziegler v.

Aukerman*, No. 06-2618, --- F.3d ---, 2008 U.S. App. LEXIS 701, *9, slip op. at 4 (6th Cir. Jan.

-12-

14, 2008). Here, there is no dispute that Defendants Harris and Burdyshaw were state actors. Not surprisingly, however, the parties come to diametrically opposed conclusions on whether Harris and Burdyshaw violated Fuller's constitutional rights, and whether the case is appropriate for summary judgment in light of facts that are still in dispute.

Claims of qualified immunity are "ordinarily examined in two steps." *Curry v. Saginaw City Sch. Dist.*, No. 06-2439, --- F.3d ---, 2008 U.S. App. LEXIS 881, *9, slip op. at 4 (6th Cir. Jan. 16, 2008). First, a court "must consider whether the facts, viewed in the light most favorable to the plaintiff, 'show the offic[ial's] conduct violated a constitutional right.'" *Id.* (brackets included) (quoting *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (in turn quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001))). Then, "[i]f, and only if," a constitutional violation is found "should the Court consider qualified immunity and address the second question: whether the right violated was clearly established."[13] *Marvin*, 509 F.3d at 245

---

[13]The Sixth Circuit also explained in *Curry* that
[t]he Sixth Circuit has occasionally expanded [the qualified immunity] inquiry into a three-step sequential analysis: "The first inquiry is whether the Plaintiff has shown a violation of a constitutionally protected right; the second inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; and the third inquiry is 'whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights.'" *Tucker v. City of Richmond,Ky.*, 388 F.3d 216, 219 (6th Cir. 2004) (quoting *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002)). The third inquiry impacts the analysis when despite the violation of a clearly established constitutional right, the official's conduct was objectively reasonable, and so should still enjoy qualified immunity. *See Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005) ("If we find the first two requirements have been met, the final inquiry is 'whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003))).
*Curry*, 2008 U.S. App. LEXIS 881 at *9-10, slip op. at 4.
Here, the Court finds no constitutional violation, and therefore no need, pursuant to the Sixth Circuit's explanation in *Curry*, to invoke the "occasional" third inquiry.

(emphasis added).  *See also Saha v. Ohio State Univ.*, No. 07-3322, 2008 U.S. App. LEXIS 922, *2 (6th Cir. Jan. 9, 2008) (unpublished) (citing *Marvin*, *supra*, and explaining that "[i]n those instances where the district court determined that [the § 1983 plaintiff] failed to allege a constitutionally viable claim, this court dismisses on that ground rather than looking to qualified immunity.").

In other words, the term "qualified immunity" most accurately refers to the second question (and perhaps the third) in the analysis, rather than the first; "qualified immunity need only be granted if there is a violation of a constitutional right, but that right was not clearly established at the time the official violated it."  *Marvin*, 509 F.3d at 244.  Accordingly, Defendants Harris and Burdyshaw are entitled to summary judgment as a matter of law – without reaching the qualified immunity analysis – if their actions on January 3, 2003 against Fuller did not violate Fuller's constitutional rights.

"Claims regarding police officers' use of excessive force in the course of an arrest or other seizure are governed by the Fourth Amendment."  *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citing *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (in turn citing *Graham v. Connor*, 490 U.S. 386, 395 (1989))).  "A claim of excessive force in the course of making an arrest . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard."  *Marvin*, 509 F.3d at 244 (citing *Graham*, 490 U.S. at 388).  According to the Sixth Circuit's most recent interpretation of *Scott*, the question for the courts when applying the Fourth Amendment's "objective reasonableness" standard is simply "whether [the officer's] actions were objectively reasonable."  *Id.* (alteration in original) (citing *Scott*, 127 S. Ct. at 1776).

-14-

In determining the reasonableness of the manner in which a seizure is effected, the Court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott*, 127 S. Ct. at 1778 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)); *Marvin*, 509 F.3d at 244-45. In so doing, the Court considers several factors. *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 174 (6th Cir. 2004). Specifically, the Court "should pay particular attention to the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citations and internal quotations omitted)); *see also Marvin*, 509 F.3d at 245 (citing *Graham*, 490 U.S. at 396; *Solomon*, 389 F.3d at 174). Additionally, the Sixth Circuit considers the demeanor of the suspect in assessing the objective reasonableness of the force used. *See Marvin*, 509 F.3d at 245 (quoting *Solomon*, 389 F.3d at 174).

*Graham* "dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force," which is measured by the above-listed factors. *See Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002) Critically, however, these factors are not an exhaustive list, and the ultimate inquiry is whether the seizure was reasonable under the "totality of the circumstances." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2005).

It is well-settled that "[t]he use of force during a *Terry* stop must be reasonable 'based upon the facts known to the officers [on the scene] at the time of the stop.'" *Humphrey v. Mabry*, 482 F.3d 840, 849 (6th Cir. 2007) (quoting *Houston v. Clark County Sheriff Deputy John*

-15-

*Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999)).  Reasonableness must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 846 (citing *Graham*, 490 U.S. at 396; *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 n.3 (6th Cir. 1995)).

> Starting the analysis with the first factor – the severity of the crime at issue – it is unclear exactly what crime was at issue when Harris and Burdyshaw confronted Fuller on the front step of Morris Black Place Unit G.  From the representations in the officers' affidavits, the Court assumes that the suspected crime was trespassing in what the officers believed was a CMHA community policing mini-station, or some similar offense such as breaking and entering or burglary.

> Under Sixth Circuit precedent, trespassing is sufficiently minor to weigh against the objective reasonableness of certain levels of force.  *See Solomon*, 389 F.3d at 174.  In *Solomon*, however, the trespassing was by a mother and several children in her charge who purchased tickets for a movie, entered a different movie than the one for which she purchased tickets, and was subsequently asked to leave.  *Solomon*, 389 F.3d at 170-72.  When she refused, officers declared that the woman was trespassing and then used clearly excessive force to take the unresisting woman into custody.  *Id.* at 172-75.  Here, the setting was after dark on a Friday early evening, with Harris and Burdyshaw first observing two men talking near Unit G, then observing the two men disperse with one of the unknown individuals entering a unit that was, to their understanding and to all outward appearances, a CMHA community policing sub-station.  Reasonably believing that the unknown individual was trespassing (or worse), Harris and Burdyshaw had a reasonable suspicion that a crime was afoot.  Their use of force developed out

-16-

of the exchange that occurred next.  Therefore, the crime in this case, whether trespassing or

otherwise, neither weighs in favor of, or against, the reasonableness of the force applied

to Fuller.

   The other three factors for the Court's consideration all weigh in favor of the

objective reasonableness of the level of force Harris and Burdyshaw applied.  Considering the

factors out of "order" for a moment, the third factor – whether a subject is actively resisting

arrest or attempting to evade arrest by flight – weighs decidedly in favor of finding that the force

used was objectively reasonable.  Defendants do not argue that Fuller was attempting to evade

arrest by flight.  They do, however, argue that Fuller actively resisted during a *Terry* stop and

search.  Critically, Fuller himself testified in his deposition that "naturally I resist[ed]" when

Harris initially took his arm.  Fuller admitted that he actually pulled Harris toward him.  This

active resistence led to the scuffle on the stoop, which in turn led to the three men tumbling off

the stoop.  Though Fuller testified that Harris and Burdyshaw began "punching" him in the face

after he resisted, Fuller cannot describe with any real clarity what, exactly, happened once the

tangle of men hit the ground, except that the officers fell on top of him.  Thus, the Court has only

the two officers' affidavits on which to rely in concluding that Fuller continued to struggle with

them while on the ground.

   As the Supreme Court has instructed, "the reasonableness of the officer's belief as

to the appropriate level of force should be judged from [the] on-scene perspective."  *Saucier v.

Katz*, 533 U.S. 194, 205 (2001).  Here, faced with a suspect actively resisting during the course

of a valid *Terry* stop and pat-down, the officers' use of physical force, including pepper spray

and then handcuffs – in that order and after repeated warnings to Fuller[14] – was, in the Court's view, an objectively reasonable response.

Next, the fourth consideration factor – Fuller's demeanor – weighs in favor of finding the officers' use of force objectively reasonable.  Fuller's demeanor negatively colored the entire encounter and directly gave rise to the violence that eventually occurred.  Fuller alleges that Harris and Burdyshaw approached him with guns drawn,[15] demanding to know whether Fuller lived in Unit G, what he was doing, who he was, and whether he had been drinking.  Though Fuller disclosed his name to the officers, he only stated that he was "using the John" in the apartment, and that he was a CMHA employee.  He did not produce his employee identification,[16] and proceeded to argue with the officers.  Had Fuller simply cooperated with the officers by calmly providing his name and identification card proving that he was a CMHA employee, and explaining that he was an employee finishing his work for the day, the whole

---

[14]Case law in the Sixth Circuit stands for the proposition that pepper spray applied to a person already restrained in handcuffs and subdued can be per se excessive force.  *See Champion v. Outlook Nashville, Inc.,*380 F.3d 893, 903 (6th Cir. 2004) (finding that "it is clearly established" that pepper spray used against a suspect after the suspect was handcuffed and subdued was excessive) (citing *Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir. 1994) (spraying mace on a person already blinded by mace, in handcuffs, and placed in police car violates the right to be free from excessive force); *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) ("Courts have consistently concluded that using pepper spray is excessive force in cases where . . . the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else.")).
Fuller argues against summary judgment, in part, based on this view of the law.  The Court need not analyze the issue, however, because the uncontested facts establish that Fuller was pepper sprayed <u>before</u> he was handcuffed or placed in a police vehicle.

[15]Harris and Burdyshaw deny that they drew their weapons before approaching Fuller on the stoop.  Assuming they had guns drawn, this unfortunate decision likely exacerbated matters by making the confrontation unnecessarily adversarial.

[16]Though the officers did not affirmatively request to see Fuller's identification, he could have offered up the ID card unprompted.

-18-

matter would have ended; the pat-down and subsequent physical altercation occurred while the officers awaited confirmation that Fuller was a CMHA employee.  Showing the CMHA-issued employee identification card would have eliminated the wait period (and, therefore, the pat-down).

Alas, Harris and Burdyshaw found Fuller to be uncooperative, to say the least. Fuller's deposition testimony confirms this picture of a confrontational situation, exacerbated by Fuller's affirmative statements to the officers and non-cooperative answers to their questions. For instance, Fuller testified that "[a]t one point [Burdyshaw] admitted a statement about telling me to shut up because they ask all the questions.  And I replied to him, well, I can ask question [sic], too.  What is going on?"  (Pl. Dep. at 35:21-24.)  Similarly, Fuller repeatedly questioned Harris about why he was going to pat Fuller down, rather than disclosing that Harris would find Fuller's work tools, and nothing more.  Therefore the Court finds that Fuller's demeanor – viewed in light of Fuller's own testimony – weighs in favor of finding Harris and Burdyshaw's actions objectively reasonable.

Finally, the second factor – whether Fuller represented an immediate threat to the safety of the officers or others – weighs in favor of finding that the force used was objectively reasonable.  Even though Fuller may not have posed a substantial threat to other persons not involved in the incident, his behavior from the outset of the confrontation constituted a potential threat to Harris and Burdyshaw.  Both officers state that Fuller's actions in "fidgeting with his clothing and pockets" caused them concern for their safety, and it was at that point that Harris asked Fuller whether he (Harris) needed to be aware of anything before patting Fuller down. The *Terry* stop pat-down for weapons while the officers were trying to verify Fuller's identity as

-19-

a CMHA employee was objectively reasonable, as explained in the following section.  Thus Fuller had no lawful basis to actively resist the pat-down.  Resist he did, however, as he admitted doing in his deposition testimony.  Rather than verbally or physically resisting the officers' efforts, a better choice for Fuller would have been to answer Harris's question and disclose that he had work tools on his person, which included a utility knife.  Unfortunately, Fuller chose a different course of action and physically resisted the *Terry* pat-down.

Harris and Burdyshaw faced an uncooperative individual whom the officers suspected of breaking the law, whose actions were arguably consistent with those of one carrying a concealed weapon, and who physically resisted upon initiation of a pat-down for weapons.  Accordingly, the threat that Fuller potentially posed to Harris and Burdyshaw also weighs in favor of finding that the officers' actions were objectively reasonable.

After considering the totality of the circumstances and the appropriate factors as outlined by the Sixth Circuit, the Court finds that Defendants Harris and Burdyshaw did not violate Fuller's Fourth Amendment rights in their use of force when detaining Fuller.  Consequently, the Court need not engage in any analysis of whether qualified immunity shields Harris and Burdyshaw from liability; Fuller's § 1983 excessive force claims fail as a matter of law in the absence of a constitutional violation.  Therefore Harris and Burdyshaw are entitled to summary judgment on Amended Count I.

### 2.  Individual Defendants Jakub and Jackson

If there is no constitutional violation found in Harris and Burdyshaw's use of force against Fuller, there exists no constitutional violation to support a § 1983 excessive force claim against individual Defendants Jakub and Jackson, who were not personally involved in the

-20-

incident at Morris Black Place.  It is unclear exactly what basis for liability Fuller attributes to Jakub and Jackson, but whether Fuller's allegations are based on a failure to supervise or a failure to train[17] does not change the proper outcome; both theories require a constitutional violation in the first instance before liability attaches up the supervisory chain.

First, if liability is premised on failure to supervise, "[a]t a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  *Ontha v. Rutherford County, Tennessee*, 222 Fed. Appx. 498, 504 (6th Cir. 2007) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999), *cert. denied*, 530 U.S. 1264 (2000)) (emphasis added).

Second, to establish liability for failure to train, "such liability attaches only if a constitutional violation is 'part of a pattern' of misconduct or 'where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to occur.'"  *Ontha*, 222 Fed. Appx. at 504 (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982), *cert. denied*, 459 U.S. 833 (1982)) (emphasis added).

Here there was no unconstitutionally excessive force used against Fuller, and therefore no liability attaches to Defendants Jakub or Jackson as a matter of law.  Accordingly, Defendants Jakub and Jackson are entitled to summary judgment on Amended Count I.

---

[17]Note that these theories of "failure to train" or "failure to supervise" are different than the state law negligence claims found in Amended Counts VI and VII.  *See, e.g.*, *Dunigan v. Noble*, 390 F.3d 486, 494 (6th Cir. 2004) (explaining that "[b]ecause the Fourth Amendment does not duplicate state tort law, we make no judgment as to whether under the facts of this case [the police officers] exercised reasonable care in the 'tort sense.'")

### 3.  Defendant CMHA

Finally, although the standard for municipality liability in the § 1983 context is different than that for individual officers, the result is the same.  "For liability to attach [to a municipality], there must be execution of a government's policy or custom <u>which results in a constitutional tort</u>."  *Gregory v. Shelby County, Tennessee*, 220 F.3d 433, 441 (6th Cir. 2000) (citing *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978)) (emphasis added).

Here there was no unconstitutional excessive force used against Fuller, and therefore no liability attaches to Defendant CMHA on Fuller's § 1983 excessive force claim as a matter of law.  Accordingly, Defendant CMHA is entitled to summary judgment on Amended Count I.

### B. § 1983 Search and Seizure (Amended Count II)

In Amended Count II, Fuller alleges that he was subjected to an unconstitutional search and seizure.  Defendants Harris and Burdyshaw again claim qualified immunity.

There is no dispute that Fuller was "seized" under the Fourth Amendment.  Under the facts as viewed in the light most favorable to Fuller, Harris and Burdyshaw "seized" Fuller within the meaning of the Fourth Amendment when they approached Fuller on the stoop with weapons drawn.  *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (explaining that "[e]xamples of circumstances that might indicate a seizure . . . would be the threatening presence of several officers, <u>the display of a weapon by an officer</u>, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." (emphasis added)).

-22-

Similarly, there is no dispute that Harris attempted to pat Fuller down for weapons, which constitutes a search. The Fourth Amendment to the Constitution, however, "forbids . . . not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *United States v. Campbell*, 486 F.3d 949, 953 (6th Cir. 2007). Therefore, the question of law the Court must decide is whether Fuller's seizure and subsequent pat-down were reasonable (and therefore constitutional).

### 1. Collateral Estoppel

At the outset, the Court notes that there may be an issue of collateral estoppel (i.e. issue preclusion) that prevents Fuller from relitigating his search and seizure claims. Specifically, there exists a question of whether Fuller may litigate such claims in his § 1983 action despite the state court's denial of his motion to suppress evidence in the state criminal proceedings. Defendants contend that, under Ohio's issue preclusion law, Fuller had a full and fair opportunity to litigate his claim that the search and seizure were unconstitutional in the form of his motion to suppress. Fuller argues that issue preclusion would be inappropriate here, given the absence – due to Fuller's eventual acquittal – of an opportunity to appeal the state court's finding that the search and seizure were constitutional. The Court requested supplemental briefing on the issue from both sides.

While Defendants' brief did not contain an in-depth analysis of whether issue preclusion should apply here,[18] their position has some support in case law. For instance, in an

---

[18]Defendants' brief provides only a generalized overview of Ohio's issue preclusion law and asserts a few facts which, in Defendants' view, show that issue preclusion applies here. There is little, if any, additional substantive analysis of the law surrounding the issue. Furthermore, the extent of Defendants' application of the law to the facts of the instant case is limited to arguing that Fuller had the same attorney in the criminal matter, he had incentive to fully litigate the issue

unpublished opinion, the Sixth Circuit addressed an argument that an unsuccessful motion to suppress was not a "final judgment" because an acquittal negated the need to file an interlocutory appeal.  *See Prokos v. City of Athens*, 118 Fed. Appx. 921, 927 (6th Cir. 2004).  The *Prokos* court interpreted a previous Sixth Circuit case as holding that "not having an opportunity to appeal a probable cause determination is not indicative of not having a full and fair opportunity to litigate the issue." *Id.* (citing *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987) (later abrogated on different grounds)).  The *Prokos* opinion, however, 1) is unpublished, and therefore not binding authority on the Court; and 2) arguably misquoted *Coogan*.  In *Coogan*, the court specifically cited the fact that the plaintiff had contested the probable cause finding to the state appellate court, and that "[u]nder these circumstances we believe [the plaintiff] is collaterally estopped from raising the issue of probable cause in his § 1983 claim for malicious prosecution."  *Coogan*, 820 F.2d 170, 175 (emphasis added).  Thus, the *Coogan* court was contemplating a situation that was critically and factually distinguishable from the facts in *Prokos*, or in the instant case, in that the plaintiff had appealed his probable cause finding in the state court proceedings.

Additionally, a dicta footnote in another Sixth Circuit (published) opinion noted that collateral estoppel can bar the relitigation of the issue of probable cause in a later § 1983 suit even where the defendant in the prior criminal case was acquitted.  *Lomaz v. Hennosy*, 151 F.3d 493, 499 n.8 (6th Cir. 1998) (citing *Coogan*, 820 F.2d at 175).  Again, this statement is not binding on the Court, because it was simply a dicta statement.  Moreover, the *Lomaz* court also

because he was facing felony charges, and he had a fair opportunity to present the issue before the state judge.  (ECF No. 64, Def. Rep. Br. 11.)

-24-

noted that "some courts have held that a 'full and fair opportunity to litigate an issue,' which is

an indispensable prerequisite to the application of collateral estoppel, includes the opportunity to

appeal an adverse ruling – an opportunity denied to acquitted defendants." *Id.* (citing published

cases from the 10th, 2d, and 7th Circuits).

            Despite the potential merit to Defendants' argument in favor of precluding

Fuller's search and seizure claims, there are also compelling reasons to find otherwise.  As

Defendants acknowledge, Ohio courts generally do not apply issue preclusion to criminal court

rulings and subsequent civil rights litigation.  (ECF No,. 64, Def. Rep. Br. 12.)  *See also, e.g.*,

*Boone v. Spurgess*, 385 F.3d 923, 927 (6th Cir. 2004) ("Ohio state courts generally frown upon

the use of criminal proceedings to estop parties in subsequent civil proceedings.") (citations

omitted)); *Booker v. City of Beachwood*, 2007 U.S. Dist. LEXIS 24773, *10 (N.D. Ohio April 3,

2007) (concluding that "[b]ecause Defendants seek to have a criminal state court proceeding bar

Plaintiff from asserting claims in a [§ 1983] civil action, and Ohio courts 'generally frown' upon

such use, this court shall not permit it.") (citing, *inter alia*, *Knott v. Sullivan*, 418 F.3d 561, 567

(6th Cir. 2005)).

            Moreover, the Court is troubled by the fact that the state court's judgment on

Fuller's motion to suppress was never assessed or reviewed by an appeals court; litigants must

have a "full and fair opportunity" to litigate the potentially precluded issues in state court.  *See*

*Allen v. McCurry*, 449 U.S. 90, 104 (1980); *Walker v. R. Schaeffer*, 854 F.2d 138, 142 (6th Cir.

1988).  Additionally, the Ohio Supreme Court has described issue preclusion as precluding

"further action on an identical issue that has been actually litigated and determined by a valid

and <u>final</u> judgment as part of a prior action among the same parties or those in privity with those

parties." *State v. Williams*, 76 Ohio St.3d 290, 294, 1996 Ohio 408, 667 N.E.2d 932 (1996) (emphasis added).  Under Ohio law, "an order denying a motion to suppress does not constitute a final, appealable order." *State v. Barnes*, 2003 Ohio 984, *P5, 2003 Ohio App. LEXIS 929, **3 (Ohio App. 4th Dist. 2003) (citing Ohio Revised Code § 2505.02 and interpreting Ohio appellate caselaw).  Also, Ohio law requires that the rejected claim be "essential" to the state court's judgment.  *McKinley v. City of Mansfield*, 404 F.3d 418, 429 (6th Cir. 2005) (citing *Goodson v. McDonough Power Equip., Inc.*, 2 Ohio St. 3d 193, 443 N.E.2d 978, 985 (Ohio 1983)).

Defendants' brief provides no analysis to clarify whether such a single (unappealed) state-court ruling, in a pre-trial proceeding, can constitute a "full and fair" opportunity to litigate an issue in compliance with due process concerns.  Similarly, Defendants provide no binding authority that a decision that is not considered a final appealable order can be considered a "valid and <u>final</u>" judgment for purposes of later issue preclusion.  Finally, Defendants' brief does not explain whether a decision denying a motion to suppress can be considered "essential" to an ultimate judgment of acquittal.

In light of these critical but unanswered questions and the absence of controlling, published Sixth Circuit authority, the Court declines to make a ruling on whether collateral estoppel applies.  Instead, the Court will review Fuller's search and seizure claims on the merits.

### 2.  Review of Fuller's Search and Seizure Claims on the Merits

#### a.  The Stop

A search and seizure without a warrant by police officers is presumptively unreasonable, although several exceptions apply.  *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007).  An officer "may permissibly conduct an investigatory stop when he or she can point

-26-

to 'a particularized and objective basis' that 'leads . . . reasonably to [the conclusion] in light of [the officer's] experience that criminal activity may be afoot and that the persons with whom [the officer] is dealing may be armed and presently dangerous.'"  *Humphrey*, 482 F.3d at 846 (quoting *Terry*, 392 U.S. at 30; *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999)).

Such a so-called *Terry* investigative stop "do[es] not violate the Fourth Amendment where the officer 'possesses a reasonable and articulable suspicion that a person has been involved in criminal activity' and, in such situations, the officer can briefly detain the person 'to investigate the suspicious circumstances.'"  *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 826 (6th Cir. 2007) (quoting *United States v. Heath*, 259 F.3d 522, 528 (6th Cir. 2001) (in turn citing *United States v. Hurst*, 228 F.3d 751, 756-57 (6th Cir. 2000)); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972)).  In other words, a *Terry* investigative stop "is permissible where officers assess all the objective facts and circumstances, and that assessment 'raise[s] a suspicion that the particular individual being stopped is engaged in wrongdoing.'"  *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).  "Reasonable suspicion for an investigative stop must be considered under the totality of the circumstances, considering 'all the information available to law enforcement officials at the time.'"  *Humphrey*, 482 F.3d at 846 (quoting *Feathers v. Aey*, 319 F.3d 843, 847 (6th Cir. 2003)).

Here, the Court initially finds that the facts as alleged show that Defendants Harris and Burdyshaw effected a constitutionally valid *Terry* investigative stop.  Harris and Burdyshaw had reasonable suspicion to initially detain Fuller, if only to try to verify his identity and his justification for entering Unit G.  Critically, they personally observed a single individual,

not dressed in a police uniform, enter a building identified as a CMHA community policing

mini-station after a brief conversation with another unknown individual.  The unknown entrant

did not answer when Harris and Burdyshaw pounded on the door or windows, and the door to

the unit was locked.  In such circumstances, an ordinary police officer observing the situation

would have a particularized, objectively reasonable belief that a crime was afoot.  This fact,

combined with uncertainty about what they might encounter with the unknown individual, was

enough for the officers to initiate the investigative stop as Fuller exited Unit G.  Accordingly, the

Court finds that the *Terry* stop was objectively reasonable and therefore not violative of Fuller's

Fourth Amendment rights.

### b.  The Search

Even if the *Terry* investigative stop is permissible, officers may not automatically

conduct a routine physical pat-down of a person detained pursuant to the *Terry* stop.  Instead, the

Supreme Court has explained that, "during a *Terry* stop, 'a reasonable search for weapons for the

protection of the police officer, <u>where he has reason to believe that he is dealing with an armed</u>

<u>and dangerous individual</u>, regardless of whether he has probable cause to arrest the individual for

a crime,' is permissible."  *Campbell*, 486 F.3d at 954-955 (quoting *Terry*, 392 U.S. at 27)

(emphasis added).  Notably, *Terry* does not require the officer to "'be absolutely certain that the

individual is armed; the issue is whether a reasonably prudent man in the circumstances would

be warranted in the belief that his safety or that of others was in danger.'"  *Id.*  A *Terry* stop pat-

down is "for the limited purpose of ensuring the safety of the officer and others around him."  *Id.*

Therefore the search must "'be confined in scope to an intrusion reasonably designed to discover

-28-

guns, knives, clubs, or other hidden instruments for the assault of the police officer.'" *Id.* (quoting *Terry*, 392 U.S. at 29).

Returning once again to the stoop in front of Morris Black Place Unit G, the *Terry* pat-down Harris and Burdyshaw initiated was constitutionally permissible.  Harris and Burdyshaw assert that Fuller was uncooperative and hostile, and that he was "fidgeting with his clothes and pockets," which caused them to be concerned for their safety.  Unfortunately, Fuller did not provide the officers with any kind of physical identification – which he testified he carried on his person but inside his coat – that would confirm he was a CMHA fireman and therefore relieve Harris and Burdyshaw's safety concerns.[19]  Fuller's deposition testimony reconfirms the officers' view of Fuller's demeanor, and does not contradict the view that Fuller was fidgeting suspiciously as the three men were standing on the stoop.[20]

Moreover, the officers' concerns could only be enhanced by Fuller's response when Harris asked Fuller at least twice – <u>before</u> patting Fuller down, and, indeed, before either Harris or Burdyshaw ever physically touched Fuller – whether Fuller had anything on him about which Harris should know.  Fuller conceded that he refused to answer Harris's reasonable questions informatively.  Furthermore, he does not dispute the officers' assertions that Fuller threatened them by declaring "[i]t was on!" if anyone touched him.

---

[19]Harris and Burdyshaw's assertions that Fuller "ultimately started muttering that he was Tommie [sic] Fuller and did not have to tell us anything," (Burdyshaw's Aff. ¶ 2; Harris's Aff. ¶ 2) is not refuted by Fuller's deposition testimony that he told the officers his name and that he worked for CMHA.

[20]The Court notes that Harris and Burdyshaw's behavior during their initial encounter with Fuller is certainly not above reproach.  The Court cannot help but lament the feeling that events might have progressed differently had Harris and Burdyshaw approached the encounter differently.

Considering the circumstances as Harris and Burdyshaw believed them to be (i.e. potential criminal activity), Fuller's belligerent demeanor, and Fuller's "fidgeting" with what a "reasonably prudent man in the circumstances" could have reasonably assumed was a weapon, and Fuller's purported threat to the officers, the Court finds Harris's subjective concern for his and his partner's physical safety was objectively reasonable.[21]  Hence, a limited *Terry* pat-down for weapons was an objectively reasonable search that did not violate the Fourth Amendment.

The Court finds that Defendants Harris and Burdyshaw's search and seizure of Fuller were objectively reasonable in light of all the facts and circumstances as Harris and Burdyshaw understood them to be at the time.  Therefore, the *Terry* stop and pat-down Harris and Burdyshaw effected did not violate Fuller's Fourth Amendment rights, and Fuller's § 1983 claim predicated on an alleged unreasonable search and seizure must fail as a matter of law. Consequently, Harris and Burdyshaw are entitled to summary judgment on Amended Count II.

Additionally, as with Fuller's § 1983 excessive force claim, his § 1983 claims based on an alleged unreasonable search and seizure as against Defendants Jakub, Jackson, and CMHA must also fail as a matter of law in the absence of a constitutional violation in the first instance.  Accordingly, Defendants Jakub, Jackson, and CMHA are each entitled to summary judgment on Amended Count II as well.

## C. § 1985 Conspiracy (Amended Count IV)

Defendants all move for summary judgment on Fuller's § 1985 Conspiracy claim contained in Amended Count IV.  Defendants argue that they cannot be liable for a conspiracy

---

[21]The fact that Fuller actually HAD a knife on him is of no import to the legal analysis of whether the *Terry* pat-down was constitutionally permissible.

claim under the so-called "intra-corporate conspiracy doctrine."  Fuller's Response and Sur-Reply briefs do not address the § 1985 claims, and therefore the Court treats Defendants' motions as unopposed.

Under the intra-corporate conspiracy doctrine, a corporation (or a political subdivision) "cannot conspire with its own agents or employees."  *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991) (citation omitted). Similarly, so long as the employees are acting within the scope of their employment, there are not two separate "people" to form a conspiracy as required to make a successful § 1985 conspiracy claim.  *See id.*

In the absence of any argument to the contrary, the Court finds that the individual Defendants were all acting in the scope of their employment for purposes of Fuller's § 1985 conspiracy claims.  Consequently, Fuller's § 1985 conspiracy claims in Amended Count IV must fail as a matter of law, and summary judgment for all Remaining Defendants is appropriate.

**D.  Remaining State Law Tort Claims**

Fuller's Amended Complaint contains claims under Ohio statutory and common law in addition to his federal constitutional claims, as recounted previously in Section II.  A district court "may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it had original jurisdiction."  *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 583 (6th Cir. 2007) (citing 28 U.S.C. § 1367(c)(3)).  "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed."  *Novak*, (quoting *Musson Theatrical v. Federal Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996)).  Furthermore, a

district court may decline to exercise supplemental jurisdiction over state law claims if "the claim raises a novel or complex issue of State law."  28 U.S.C. § 1367(c)(1).

Here, Fuller filed his case in federal court at the outset, citing federal question jurisdiction under 28 U.S.C. § 1331 because of his §§ 1983 and 1985 claims.  He asserted supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367.  The Court declines to exercise supplemental jurisdiction over Fuller's state law claims for two reasons.

First, the Court has dismissed all of Fuller's federal question claims over which it had original jurisdiction.  Therefore dismissal of his state law claims is appropriate under 28 U.S.C. § 1367(c)(3).

Second, Fuller's state law claims are subject to unique and complex legal questions surrounding Ohio's applicable sovereign immunity law.  For instance, there is a question of whether Fuller's civil action is "relative to any matter that arises out of the employment relationship" under Ohio law.  If so, any sovereign immunity Defendant CMHA might enjoy as to Fuller's state law claims would be abrogated, pursuant to Ohio Revised Code § 2744.09(B).

Also, this suit arose under the old (unamended) version of O.R.C. § 2744.02.  While the amended version of § 2744.02 creates a premises liability provision, the unamended version of § 2744.02 arguably contemplates a broader range of negligence liability.  An Ohio state court must interpret the old (operative) version of § 2744.02 to determine whether the unamended statute strips CMHA's claim of sovereign immunity.[22]

---

[22]The question of the scope of § 2744.02, of course, assumes *arguendo* that Fuller can demonstrate that the alleged negligence occurred within or on the grounds of buildings that are used in connection with the performance of a governmental function.

Finally, there is a question of whether O.R.C. § 2744.03(A)(3) operates to reattach any sovereign immunity that might be stripped under § 2744.02; the case law is unclear about whether § 2744.03(A)(3) contemplates immunity for negligent hiring, retention, training, and supervision claims, as Defendant CMHA claims, or instead only covers political, public-policy decisions made by those officials at the top of the governmental chain of command.[23]

All of these questions involve detailed and complex interpretation of Ohio law that is more appropriately left to Ohio courts in the absence of any remaining federal question jurisdiction, and dismissal of the state law claims is similarly appropriate under 28 U.S.C. § 1367(c)(1) as well.

Accordingly, the Court declines to exercise supplemental jurisdiction over Fuller's remaining state law claims pursuant to 28 U.S.C. §§ 1367(c)(1) and (3).  Fuller's remaining state law claims shall consequently be dismissed without prejudice in their entirety.

**E.  A Final Note**

The Court would be remiss if it did not include the following brief observation: while Fuller's poor decisions ultimately proved fatal to his constitutional claims, poor decisions were also made by almost all the other actors in this case.

If Harris and Burdyshaw had used better judgment from the start by asking Fuller to produce his CMHA identification, rather than just asking Fuller to self-identify, or considered

---

[23]Ohio Revised Code § 2744.03(A)(3) reattaches immunity stripped under § 2744.02 if the allegedly negligent action was "within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee."  The case law shows that arguments usually focus either on the "discretion" prong or the "with respect to policy-making, planning, or enforcement powers" prong, or both.

the fact that they saw Fuller enter Unit G without breaking in, the issue would have been over before it started.  The Court also wonders why the officers felt it necessary to approach a single, middle-aged individual with guns drawn, which undoubtedly helped create the confrontational, adversarial tone for the remaining encounter.

Jakub and Jackson are similarly not above reproach.  Jakub arrived on the scene as the supervising officer after Fuller was already in handcuffs, but he could have easily ascertained that Fuller was a CMHA employee working on his own time to prepare for the coming weekend, not a criminal in need of prosecution.  Jakub could also have readily determined that Unit G was a building CMHA heating personnel had used for their own purposes for some time, not a community policing sub-station as the old, outdated sign indicated.  Had Jakub made these findings and exercised a modicum of discretion, he would have (or should have) declined to recommend prosecution against Fuller for <u>any</u> charges, let alone charges which were quite clearly not supported by the evidence at hand.  Surely there are more pressing crime-fighting and law-enforcement concerns for CMHA than prosecuting a dependable 19-year CMHA employee as a felon.[24]  As the supervising officer, Jakub at least could have ensured that Fuller was decontaminated from the pepper-spray as quickly as possible.

The Court also directs similar criticism to the Cuyahoga County Prosecutor, who wasted taxpayer resources to prosecute a phantom offense; even cursory investigation would have revealed the complete absence of the elements necessary to convict on a charge of

---

[24]The Court also directs the same criticism to the Cleveland City Prosecutors, who wasted scarce taxpayer resources to prosecute a phantom offense; even cursory investigation by a competent prosecutor would have revealed the complete absence of the elements necessary to convict on a charge of assaulting a peace officer, let alone a charge of felonious assault on an officer causing an injury to that officer.

assaulting a peace officer, let alone a charge of felonious assault on an officer.  While the facts would arguably have supported a charge of resisting arrest, Fuller was not charged with that crime.

Jackson, for his part, is also not blameless.  For instance, there is a question of whether the officers involved here were up to date on their training and their certifications, as illustrated by the training and certification records Fuller submitted.[25]  Even if he is not personally legally liable for any constitutional claims, Jackson, as chief of CMHA police, could have ensured that procedures were in place to keep accurate training records for the officers on his police force, to verify that officers were trained appropriately, and to assure that weapons being carried by officers on patrol were authorized and certified for the particular officer.

On a broader level, the Court is baffled by CMHA's actions.  Unless there were other employment issues with Fuller that were not revealed to the Court during the course of this litigation, he was the model employee that CMHA should never have considered firing over the singular incident on January 3, 2003.  Fuller worked for nineteen years with perfect attendance at a highly technical, skilled, and specialized occupation.  He strikes the Court as a valuable and dedicated employee which CMHA should have retained, with some punishment short of termination.  And while an arbitrator may very well have found that Fuller's conduct did not warrant termination, Fuller's union inexplicably dropped the ball in failing to proceed in a timely fashion on Fuller's grievance, resulting in the dismissal of Fuller's claims.

---

[25]If a lawyer's law license expires, he or she cannot legally practice law or appear before the Court, even if the attorney's license is expired by a single day.  Similarly, if a law enforcement officer is required to have a current certification to carry pepper-spray, a Taser, or other such "less than lethal" weaponry, the officer should not be carrying the particular weapon if that certification is expired.

Finally, the attorneys involved – on both sides – did not help the situation.  There was unnecessary, expensive litigation over filing deadlines, savings statutes, claims that had little or no basis in law, an amended complaint that apparently tried to reinstate claims already dismissed, and motions and briefs that mis-stated, mis-represented, or mis-cited the applicable law.  The Court was disappointed to observe the generally adversarial nature of discourse between counsel, nit-picking over the slightest procedural detail rather than making any attempt to reach a mutually agreeable result for the clients.  Certainly there has been more than ample time for resolving this case.[26]  The Court urges the two sides to reach an agreement to resolve the dismissed state law claims, rather than simply moving their legal jousting to the state courts.

## V.  CONCLUSION

For the reasons stated above, the Court hereby **GRANTS IN PART** the remaining Defendants' Motions for Summary Judgment **(ECF Nos. 58, 59, 60)** and Amended Counts I, II, and IV are hereby **DISMISSED WITH PREJUDICE**.

The Court also **DENIES IN PART** the remaining Defendants' Motions for Summary Judgement **(ECF Nos. 58, 59, 60)** and Amended Counts V, VI, and VII are **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

 _/s/Dan A. Polster    February 6, 2008_
**Dan Aaron Polster**
**United States District Judge**

---

[26]The above-captioned case is actually the second go-round for the Court on this matter. Fuller initially filed his suit on January 3, 2005 (Case No. 1:05-CV-9), and the Court repeatedly engaged the parties in settlement discussions before the parties agreed to dismiss the case without prejudice on August 30, 2005.  Fuller then filed the instant suit (Case No. 1:06-CV-2093) on August 30, 2006, after which the Court continued to engage the parties in settlement discussions, to no avail.